GREAT WEST STEEL INDUSTRIES, LTD., Plaintiff-Appellant and Cross-Appellee, v. NORTHBROOK INSURANCE COMPANY, Defendant-Appellee and Cross-Appellant.

First District (4th Division)   No. 84—402

Opinion filed October 3, 1985.

Willis R. Tribler and Douglas C. Crone, both of Chicago (Haskell & Per-

rin, of counsel), for appellant.

Ronald A. Jacks, David M. Stahl, Sarah H. Steindel, and James K. Meguerian, all of Isham, Lincoln & Beale, of Chicago, for appellee.

JUSTICE JOHNSON delivered the opinion of the court:

Great West Steel Industries, Ltd. (Great West), appeals from the judgment of the Cook County circuit court which, in a bench trial, found that Northbrook Insurance Company (Northbrook) was under no obligation to defend and indemnify Great West, its insured, in two claims filed against Great West in Canada (the Canadian claims). Great West also appeals from the trial court's decision that it had failed to prove that Northbrook's conduct in investigation of the Canadian claims amounted to breach of the policy on the ground of conflict of interest. Northbrook cross-appeals from the portion of the trial court's judgment that ordered it to return to Great West the premium Great West had paid for the policy.

The parties raise the following questions for our review:

1. Whether the trial court erred in finding that the Canadian claims were excluded from coverage under the terms of the professional liability insurance policy because Great West knew of the design defects which gave rise to those claims when the policy became effective;

2. If the trial court so erred, whether it correctly found that coverage could not have been denied on the ground that Great West made material misrepresentations in its insurance application such that the policy was void and of no effect;

3. Whether Northbrook should have been estopped from raising policy or coverage defenses on the ground that it had failed to defend with a reservation of right or to institute a declaratory judgment action to determine the extent of policy coverage;

4. Whether the trial court erred in finding that Great West had not proved Northbrook's breach of policy through conflict of interest;

5. Whether the trial court erred in ordering Northbrook to return to Great West the premium it had paid upon the policy.

We reverse in part and affirm in part and remand.

The parties' pleadings, documents, and testimentary evidence established the following pertinent information. Great West was a designer and fabricator of structural steel headquartered in Vancouver, British Columbia, Canada. Northbrook was an insurance carrier with its principal place of business in Barrington, Illinois.

On approximately July 21, 1975, Great West entered into a subcontract with a general contractor, Ellis-Don, Limited (Ellis-Don), wherein

Great West agreed to design, engineer and erect the structural steel framework of a parts distribution center and warehouse to be built for General Motors Corporation (Canada) (GM). The building was to be located in Woodstock, Ontario.

Construction of the warehouse was apparently substantially completed by the winter of 1975. On February 22, 1976, a perimeter portion of the roof of the warehouse collapsed (the first roof collapse). Efforts to determine the cause(s) of the collapse and to organize remedial repair measures were undertaken through the spring, summer, and fall months of 1976.

On January 2, 1977, a second perimeter portion of the roof of the warehouse collapsed (the second roof collapse). Illustration A at the end of this opinion specifies the relative locations of the two separate collapses of the roof.

Great West's insurance carriers at the time of the first collapse were companies other than Northbrook. On October 19, 1976, Great West completed and sent to Northbrook its application for professional liability insurance for engineers' errors and omissions.

Northbrook issued a policy for such liability insurance to Great West, effective October 23, 1976. By its terms, coverage was provided for a period of one year with a maximum liability of $1 million. Great West apparently paid the premium due on the policy ($34,930 (Canadian)).

Paragraph 1 of the policy's insuring agreements stated in pertinent part that "[t]he Company [Northbrook] will pay on behalf of the Insured all sums in excess of the deductible amount stated in the Declarations which the Insured shall become legally obligated to pay as damages by reason of any act, error or omission committed or alleged to have been committed by the Insured, or any person or organization for whom the Insured is legally liable provided always that: *** [t]he Insured has no knowledge of such act, error, or omission on the effective date of this Policy."

The policy also excluded coverage of claims arising from incidents specified in, *inter alia*, questions 19A and 19B of Great West's insurance application to Northbrook. These specific questions, and Great West's responses thereto, were as follows:

"19A. Has any claim ever been made against the firm or against any persons named in question #8 above? Yes If so, state briefly the cause and nature of the claim including the amount involved and names of the project and the claimant, the date when the claim was made, the date the act giving rise to the claim was committed and the final disposition:

[Answer] Nov. 28/1973—Collapse of supermarket roof. Claim denied—no cover under CGL due to professional exclusion. Insured currently pursuing litigation against Primary Insurer. (This claim discussed in full with Mrs. Carroll).

19B. Is the Applicant aware of any circumstances which may result in any claim against him, his predecessors in business, or any of the present or past partners or officers? ___Yes ___No
If yes, please give full details on the same basis as 19A."

Thus, Great West's application made no reference to the first roof collapse. The record establishes that supporting documents submitted in conjunction with the application referred to the first roof collapse, but stated that the incident was a result of a faulty weld.

When the second roof collapse occurred in January 1977, Great West promptly notified Northbrook of the incident pursuant to the terms of the policy. Individuals representing Northbrook were dispatched to the warehouse in Woodstock the day after the collapse. Based on the investigations of this group, as well as others later working on the incident, Northbrook essentially concluded that the second roof collapse was excluded from coverage under the insurance policy.

Ellis-Don filed an action in Ontario against Great West and others on March 8, 1977, seeking indemnification for damages arising from the second roof collapse. Ellis-Don's claim against Great West alleged that Great West "failed to supply structural steel and erect the roof in accordance with its contract with [Ellis-Don]."

General Motors also filed an action in Ontario against Ellis-Don, Great West, and others on December 21, 1977, in which GM sought damages for the second roof collapse. In the pleadings, GM alleged that Great West was negligent in that:
"(a) it failed to properly design the work;
(b) it failed to properly fabricate the materials supplied;
(c) it failed to give adequate consideration to snow loading, stability against wind loading, rain water ponding and truss connection details;
(d) it failed to carry out the work in a careful and workmanlike manner with the use of fit and proper materials;
(e) it failed to properly test the work and materials;
(f) it failed to properly inspect the work and materials;
(g) it failed to properly supervise the work and the fabrication of the materials."

Northbrook refused to defend Great West in either cause. As a result, Great West was represented by its own counsel in both actions.

The parties to the Canadian claims eventually settled their dispute

pursuant to agreement. A court order which incorporated this settlement was entered on February 20, 1981. Under its terms, Great West was obligated to pay $950,000 in cash, to forfeit $309,000 in payments from Ellis-Don, and to forfeit an additional $682,700 in billings quoted for added work on the warehouse. Thus, the total expended or forfeited by Great West was $1,941,700 (Canadian dollars).

Because Northbrook refused to defend Great West in either of the Ontario actions, on December 30, 1977, Great West filed its complaint in Cook County circuit court for declaratory judgment and other relief against Northbrook.

As ultimately amended, count I of the pleading sought a declaration that Northbrook was obligated to furnish a defense and to pay any judgment (up to the limits of the policy) against Great West in the Ontario actions plus costs, expenses, attorney fees, and interest. Count II of the complaint alleged in substance that Northbrook's investigation of the second roof collapse had been in "bad faith" such that a conflict of interest had arisen, of which Northbrook had failed to inform Great West. Based on these allegations, Great West sought $4 million in compensatory damages and $5 million in punitive damages, plus costs, attorney fees, and interest.

Northbrook's ultimate answer to Great West's complaint denied the material substance of Great West's allegations. In addition, Northbrook interposed three affirmative defenses to Great West's action and further filed a counterclaim against Great West. Of these pleadings only two of the affirmative defenses are pertinent to this appeal and need be restated or considered here.

The first affirmative defense, in relevant part, claimed that coverage was properly denied because Great West's answers to questions 19A and 19B of the insurance application constituted material misrepresentations. Northbrook alleged that Great West should have disclosed the occurrence of the first roof collapse in its answers to both questions. It contended that such nondisclosure was a material misrepresentation which rendered the policy void and of no effect.

Northbrook's second affirmative defense was that coverage was properly denied because the policy excluded coverage of claims relating to any act, error, or omission alleged to have been committed by Great West, of which Great West had knowledge on the effective date of the policy. Northbrook alleged in material substance that Great West knew of the error, act, or omission which gave rise to the Ontario claims because these actions were based upon the second roof collapse; since this collapse was related to the first roof collapse, which occurred prior to the effective date of the policy, Great West knew of the claimed er-

rors at the time the policy went into effect.

Following extensive discovery and several days of bench trial upon the parties' claims, the trial court found that coverage was properly denied but nevertheless ordered Northbrook to return the $34,000 premium which Great West had paid to Northbrook. Specifically, the court's order of January 19, 1984, made the following findings and conclusions. First, the court found that Northbrook failed to sustain its burden of proof on its first affirmative defense that the policy was void because of material misrepresentations in the insurance application. The court further found, however, that Northbrook had sustained its burden of proof with regard to its second affirmative defense that Great West knew of the design error at the time the policy entered into effect. Based on these findings, the court entered judgment in favor of Northbrook and against Great West on count I of Great West's complaint. Nevertheless, the court ordered Northbrook to pay Great West an amount equal to $34,930 Canadian dollars, determined at a specified exchange rate of American dollars, which amount the court stated was to represent the premium Great West paid to Northbrook.

In addition, the court found that Great West had failed to sustain its burden of proof with regard to count II of its complaint. Accordingly, the court entered judgment in favor of Northbrook on this count.

Notices of appeal and cross-appeal were timely filed by both Great West and Northbrook. Great West seeks reversal of the trial court's judgment on counts I and II of its complaint; Northbrook seeks reversal of that portion of the trial court's judgment which ordered Northbrook to return Great West's premium payment.

I

Great West first contends that the trial court committed reversible error in finding that Northbrook had proved its second affirmative defense. This defense was that the policy did not cover the Canadian claims because, when the policy became effective, Great West had knowledge of the act, error, or omission it had committed which gave rise to those actions. Northbrook argued at trial, and the trial court so found, that Great West knew of design defects in the roof as of the effective date of the policy by virtue of the investigation and conclusions reached upon the nature and cause of the first roof collapse, which occurred prior to Great West's application for insurance with Northbrook.

Under the terms of the policy, coverage was provided for "any act, error, or omission committed or alleged to have been committed by the Insured *** provided always that *** the Insured had no knowledge of

such act, error, or omission on the effective date of this Policy." Great West argues that the evidence presented did not establish that it had knowledge of the design defects which caused the second roof collapse upon the effective date of the policy.

Northbrook's affirmative defense is premised on the theory that because Great West knew of the building's design defects from the first roof collapse, it knew that the same design errors existed in another structurally similar portion of the roof when the policy became effective. Therefore, when this second portion of the roof collapsed, Great West already knew of the error and any claim arising therefrom was excluded from coverage. The trial court found that Northbrook had sustained its burden of proof on this theory. Our standard of review is thus whether the trial court's judgment was against the manifest weight of the evidence. See *Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 408, 444 N.E.2d 220.

In order to prove its second affirmative defense, Northbrook had to show, essentially, that the second roof collapse occurred because of design defects similar to those which caused the first roof collapse. In short, Northbrook's argument presupposes that the second roof collapse was, indeed, the result of the same design errors which caused the first roof collapse. In other words, Northbrook's argument required a showing that both the first and second roof collapse were the result of the same errors in Great West's design of the roof.

■ Our thorough review of the evidence presented at trial leads us to conclude that Northbrook failed to sustain its burden of proof in this regard. The record establishes that experts in the field of structural engineering who investigated the second roof collapse discovered certain aspects of the roof's design which precipitated the collapse, and that these features had not previously been uncovered as causes of the first roof collapse during the investigation which followed that incident. Thus, Great West could have had no knowledge of these defective features of the structural design at the time the policy entered into effect.

Moreover, the evidence presented at trial shows that Great West never actually and affirmatively agreed, following the first roof collapse, that that collapse was caused by any design defect regarding distribution of snow load upon the roof. Instead, Great West recognized that an outside structural engineering firm which was retained to investigate the first roof collapse concluded that there was such a design defect in the warehouse. This independent firm reached such a conclusion, however, because it adhered to a different design philosophy with regard to distribution of snow load than the view to which Great West's structural engineers adhered. Thus, the proof establishes that the ex-

tent of Great West's knowledge of design errors following the first roof collapse was limited to an understanding that another structural engineering firm, because of its differing design philosophy, thought that Great West's design of the warehouse was in error. Consequently, we conclude that Northbrook failed to sustain its burden of proof with regard to its second affirmative defense, and that the trial court's judgment to the contrary was against the manifest weight of the evidence.

## II

Northbrook argues in the alternative that should this court find that the trial court's judgment on its second affirmative defense cannot be sustained, the trial court's judgment should nonetheless be affirmed on the basis of Northbrook's first affirmative defense. The trial court found that Northbrook failed to sustain its burden of proof on this defense, which was that the policy was void *ab initio* because of Great West's material misrepresentations in its answers to questions 19A and 19B of the insurance application.

The effect of an insured's misrepresentations in an insurance application is governed by section 154 of the Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 766), which provides:

> "No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy, and made a part thereof. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company."

In order to determine whether a misrepresentation is material, the court must consider whether it was one which might reasonably have influenced the insurer in deciding whether to accept or reject the risk (*Safeway Insurance Co. v. Duran* (1976), 74 Ill. App. 3d 846, 850, 393 N.E.2d 688), or whether different conditions would have been imposed. *Unger v. Metropolitan Life Insurance Co.* (1968), 103 Ill. App. 2d 150, 155, 242 N.E.2d 907; see also *National Boulevard Bank v. Georgetown Life Insurance Co.* (1984), 129 Ill. App. 3d 73, 85, 472 N.E.2d 80.

Our review of the record leads us to conclude that the trial

court's judgment in this regard was not against the manifest weight of the evidence. The proof adduced at trial showed that Great West's professional judgment was that the first roof collapse was not the result of an error of design, but, instead, of fabrication and construction. Thus, Great West had no reason to include a reference to the collapse in response to questions which pertained to errors or omissions of design, rather than error or omissions of construction. As a result, Northbrook failed to prove that the answers provided by Great West amounted to misrepresentations. Accordingly, we find no basis for reversal of the trial court's judgment with regard to Northbrook's second affirmative defense.

## III

■ Because of the determinations stated above, the question of whether Northbrook should have been estopped from raising policy defenses need not be addressed.

## IV

■ Great West claims that the trial court committed reversible error in finding that it had not proved the allegations of count II of its complaint which alleged conflict of interest. Upon a thorough review of the record before us, we cannot say that the trial court's decision that Great West had not proved this count was against the manifest weight of the evidence.

## V

■ Because we conclude that the trial court erroneously found that Northbrook had no duty to defend Great West in the Canadian claims, we reverse that portion of the trial court's judgment which ordered Northbrook to return Great West's premium payment. We remand the cause with instructions that the trial court enter judgment in favor of Great West on count I of its complaint and for further proceedings to determine the amount due Great West for damages based upon that count of the complaint.

For the reasons stated, the judgment of the trial court is reversed in part and affirmed in part, and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed in part and affirmed in part and remanded.

LINN, J., concurs.

## Appendix

ROOF - TOP VIEW

ARCHITECTURAL CANOPY

AREA OF 1st FAILURE

AREA OF 2nd FAILURE

EXPANSION JOINT

EXPANSION JOINT

SIDE VIEW

SHOWING CANOPY ELEVATION AND POSITION

GAP

15'

7'

NOT DRAWN TO SCALE

PRESIDING JUSTICE JIGANTI, dissenting:

Northbrook insured Great West, an architectural firm, on professional liability for any acts, errors or omissions. The policy covered the period from October 23, 1976, to October 23, 1977. This is a "claims made" or "discovery" policy. (See *Graman v. Continental Casualty Co.* (1980), 87 Ill. App. 3d 896, 900, 409 N.E.2d 387, 390.) Under this type of policy, Great West was covered for any claims made by any third party against the architectural firm for professional liability during this period. Consequently, even professional liability that may have arisen prior to the inception of this contract would be covered. However, to protect itself in an event such as that, the policy does not cover Great West for liability to third persons if Great West had "knowledge of such act, error or omission on the effective date of this policy."

The factual pattern here is unusual. Ordinarily in these controversies the event that gives rise to the claim occurs prior to the inception of the policy but the claim is made during the policy period. In this case, however, the roof collapse which is the underlying cause of action by General Motors against Great West occurred on January 2, 1977, during the course of the policy, and the claim was made within the policy period. Northbrook successfully defended itself in the trial court on the basis that the act, error or omission giving rise to Great West's liability to the third-party plaintiff occurred prior to the inception of the policy and Great West had "knowledge" of this potential claim. Great West's knowledge, according to Northbrook and the finding of the trial court, arose because on February 2, 1976, 11 months before this collapse, and seven months before the inception of the policy, another portion of this same roof collapsed. Great West's knowledge of the earlier roof collapse forms the factual basis for the majority's finding that the ruling of the trial court was against the manifest weight of the evidence. I respectfully dissent. I do not believe that Great West raises the issue of manifest weight. Even if it does I believe that salient facts were omitted by the majority. In addition, I do not believe that Great West's only contention on appeal, that is that Northbrook is estopped from raising these defenses, is well-founded. The estoppel issue will be considered first.

Because Northbrook did not defend the lawsuits filed against Great West arising out of the roof collapse on January 2, 1977, Great West contends that Northbrook is estopped to deny Great West's action here for money damages for the amount paid by Great West in the defense and settlement of that lawsuit. Great West relies on the proposition of the law that when an insurer fails to defend a claim potentially within the coverage of the policy, the insurer is estopped from raising any

defenses that it has against the insured under the policy. (*Murphy v. Urso* (1981), 88 Ill. 2d 444, 451, 430 N.E.2d 1079, 1082.) Although the proposition of law espoused by Great West has been often stated, this proposition needs examination.

Estoppel arises when the insurer breaches its duty to defend under the policy. (*Thornton v. Paul* (1978), 74 Ill. 2d 132, 145, 384 N.E.2d 335, 340.) The duty to defend is a very broad duty that is separate and distinct from the duty to indemnify. (*Conway v. Country Casualty Insurance Co.* (1982), 92 Ill. 2d 388, 394, 442 N.E.2d 245, 247.) Moreover, it has been frequently stated that this duty to defend is broader than the duty to indemnify. (*Murphy v. Urso* (1981), 88 Ill. 2d 444, 451, 430 N.E.2d 1079, 1082.) The breadth of this duty is exemplified by the defense provision in this policy which states that the insurer has the duty to defend even if the claim is "groundless, false, or fraudulent." The duty to defend, however, is not boundless. Even if the plaintiff in the underlying action against the insured alleges facts that would make the insured liable it does not necessarily mean there is a duty to defend. The duty to defend is correlative with its duty to indemnify. (7C Appelman, Insurance Law & Practice sec. 4684, at 73 (Berdal ed. 1979); see *Allstate Insurance Co. v. Gleason* (1964), 50 Ill. App. 2d 207, 214, 200 N.E.2d 383, 387.) The insurer is only bound to defend if it would be bound to indemnify the insured assuming the allegation of the plaintiff's complaint were proved. (*Brodeck v. Indemnity Insurance Co. of North America* (1937), 292 Ill. App. 363, 384-85, 11 N.E.2d 228, 237; Annot., 50 A.L.R.2d 458 (1956).) Stated differently, the claim is not potentially within the coverage of the policy.

Applying that test to the instant case, even if General Motors and the other plaintiffs in the underlying action against Great West were to prove their claims that Great West was responsible for any acts, errors or omissions that caused the roof collapse on January 2, 1977, that does not resolve the question of whether Northbrook must indemnify and consequently defend Great West. This is so because Northbrook's affirmative defense is that there is no duty to defend because there is no coverage under the policy. Specifically, the policy was contingent upon the fact that Great West had no knowledge of any possible claim. Northbrook claimed and the trial court found that they did in fact have knowledge of a possible claim. Consequently, even if General Motors proved all of the allegations in their complaint against Great West, Northbrook would not have to indemnify because there is no coverage. (See *Allstate Insurance Co. v. Gleason* (1964), 50 Ill. App. 2d 207, 214, 200 N.E.2d 383, 387.) Illinois has followed the rule that there is no duty to defend where the claim is beyond the scope of coverage in nu-

merous cases: *Schneider v. Autoist Mutual Insurance Co.* (1931), 346 Ill. 137, 139-40, 178 N.E.2d 466, 467-68 (insurer had no duty to defend where coverage was contingent upon the insured's cooperation with the insurer); *Stiefel v. Illinois Union Insurance Co.* (1983), 116 Ill. App. 3d 352, 357, 452 N.E.2d 73, 76 (insurer was under no duty to defend since the policy coverage did not extent to acts, errors or omissions of which the insured had knowledge of or could reasonably have foreseen would result in a claim); *Graman v. Continental Casualty Co.* (1980), 87 Ill. App. 3d 896, 902, 409 N.E.2d 387, 392 (insured's noncompliance with the insuring agreement resulted in no policy coverage for the claims against the insured and thus the insurer had no duty to defend); *Chambers Gasket & Manufacturing Co. v. General Insurance Co. of America* (1975), 29 Ill. App. 3d 998, 1002, 331 N.E.2d 203, 206 (insurer had no duty to defend action brought by customer against insured gasket manufacturer because the policy did not cover the damages sought by the customer); *Mann v. Mann* (1971), 133 Ill. App. 2d 552, 558, 273 N.E.2d 40, 45 (insurer's failure to defend did not invoke the estoppel doctrine as the claims against the insured were beyond the policy coverage); *Midwest Contractors Equipment Co. v. Bituminous Casualty Corp.* (1969), 112 Ill. App. 2d 134, 140-41, 251 N.E.2d 349, 352 (insurer may decline to defend where the policy coverage does not extent to the claimant); *Meyer v. Aetna Casualty Insurance Co.* (1964), 46 Ill. App. 2d 184, 190, 196 N.E.2d 707, 710 (insurer was not obligated to defend suit against the insured arising out of an auto accident in which the insured's son was driving as the policy coverage applied only to accidents occurring while the insured was driving); *Brodeck v. Indemnity Insurance Co. of America* (1937), 292 Ill. App. 363, 382-84, 11 N.E.2d 228, 236-37 (where the policy provided coverage against suits arising out of accidental injuries the insurer was not obligated to defend a suit based upon an occupational disease).

To reiterate the legal propositions to be applied in this case, estoppel arises when the insurer breaches its duty to defend. There is no duty to defend if there is no duty to indemnify. The duty to indemnify, in turn, exists only when the claim against the insured is within the scope of the policy coverage. In this case, because Great West had knowledge of the design defects in the roof on the effective date of the policy, the claims against Great West were beyond the coverage of the policy. Consequently, Northbrook had no duty to defend those claims.

The second basis for my dissent is that I do not believe the issue of manifest weight of the evidence was raised in this appeal. At only one portion of Great West's brief was manifest weight even suggested, and, at that point, it was not specifically argued. It was mentioned in the

brief concerning answers to questions 19A and B which form the issues of the cross-appeal. It is next mentioned in its conclusion again without any specific argument on the subject. Since the majority opinion rests on the issue, I will address it.

Under the pleadings the insurer, Northbrook, had to prove as part of its affirmative defense that on the effective date of the policy the insurer had knowledge of an act, error or omission. The trial court of course found that Great West did have knowledge. The majority in its opinion finds that the trial court's finding was against the manifest weight of the evidence. The majority states that a thorough review of the evidence presented below shows that Northbrook failed to sustain its burden. The majority noted that experts in the field of structural engineering who investigated the second roof collapse discovered certain aspects of the roof's design which precipitated the collapse and that these features had not previously been uncovered as causes of the first roof incident. The facts to support that contention as I see it, are not stated in the opinion. Apparently what the court is referring to is the fact that the general contractor of the GM building where the roof collapsed retained C. C. Parker & Associates to investigate the first collapse. Parker concluded that the cause of the first roof collapse was a workmanship problem specifically "resulting from a faulty weld." However, Parker found that there were "a number of areas of overstress" in the roof especially in the area of the false roof feature, caused principally by Great West's failure to comply with the National Building Code. C. C. Parker's report was mailed to Great West and it was reviewed by several Great West executives. Ellis-Don, the general contractor, continued to allege errors in Great West's design of the GM warehouse. In a letter dated March 30, 1976, Parker in answer to some representatives of Great West's contention that there were no design defects reiterated that the requirements of the building code provide a minimum standard of safety and that Great West's design provided "a standard of safety less than the minimum required by the code notwithstanding the claims made by Great West still regarding its adequacy in previous success enjoyed by them in its use." In a letter dated October 6, 1976, Ellis-Don advised Great West that the design defects identified by C. C. Parker, including those in the areas behind the false roof, had not been corrected. Ellis-Don stressed the seriousness of those defects in view of the fact that the snowfall season was rapidly approaching. Ellis-Don demanded that the remedial work be started "forthwith, and, in all events, before winter conditions prevail." Five days before the policy took effect, on October 18, 1976, two representatives of Great West met with two representatives of Ellis-Don to discuss the remedial

work to be done on the roof. At that meeting, Great West agreed with Ellis-Don that the area of the roof behind the false roof feature was underdesigned and that remedial work was required to be performed by Great West.

The majority opinion states that Great West "never actually and affirmatively agreed" following the first collapse that that collapse was caused by a design defect. That however is not the issue in the case. The issue is whether Great West had knowledge of an act, error or omission on the effective date of the policy. Whether they wished to accept the fact or not, Great West had knowledge of the fact that certain experts believed that there was a design defect.

The majority noted that an outside structural engineering firm, apparently C. C. Parker, reached its conclusion because it adhered to a different design philosophy. Because of that, the majority apparently concludes that C. C. Parker's opinion should be held for naught. The design philosophy held by C. C. Parker was that espoused in the Canadian Building Code. It does not seem to me that it may be completely disregarded.

For the above reasons I believe that the majority was in error in concluding that the finding of the trial court was against the manifest weight of the evidence.

I would affirm the judgment of the trial court.