MYRON RATCLIFFE *et al.*, Indiv. and as Trustees of the Brooks McCormick, Jr., Trust, Plaintiffs-Appellants, v. INTERNATIONAL SURPLUS LINES INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division) No. 1—88—0739

Opinion filed January 16, 1990.

Wildman, Harrold, Allen & Dixon, of Chicago (Max Wildman, Jerald P. Esrick, and Cal R. Burnton, of counsel), for appellants.

Schaefner & Rosenwein, of Chicago (Thomas D. Rosenwein and David L. Applegate, of counsel), for appellees International Surplus Lines Insurance Company and International Insurance Company.

Lord, Bissell & Brook, of Chicago (Don W. Fowler, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee Johnson & Higgins of Illinois, Inc.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:

Plaintiffs brought this action seeking a declaration of coverage under two insurance policies, a trustees errors and omissions policy (the Trustees policy) underwritten by defendant International Surplus

Lines Insurance Company (ISLIC), and a directors and officers liability and company reimbursement liability policy (the D & O policy) underwritten by defendant International Insurance Company (International), both secured by the same broker, defendant Johnson & Higgins of Illinois, Inc. (Johnson & Higgins). Plaintiffs sought reimbursement of all expenses incurred in the successful defense of three underlying suits involving the construction of a residence by plaintiff Brooks McCormick, Jr. (Brooks), and a declaration of indemnification for any future losses relating to those suits. ISLIC raised the affirmative defense that plaintiffs misrepresented certain facts in the Trustees policy application. Following a bench trial limited to proof of ISLIC's affirmative defense, the trial court found no coverage under the Trustees policy on the ground that plaintiffs failed to disclose in the policy application certain disputes between Brooks and his general contractor. Cross-motions for summary judgment on the D & O policy were then filed, and the court granted International's motion, ruling that plaintiffs were not covered under the D & O policy because they were sued as trustees and agents of trustees, not as directors and officers of Miami Corporation.

Plaintiffs now appeal, raising as issues (1) whether the trial court applied the incorrect standard in finding no coverage under the Trustees policy; (2) whether the trial court erred in finding that nondisclosure of the Brooks construction dispute was a material misrepresentation in the policy application; and (3) whether the trial court erred in finding that coverage under the D & O policy is limited to the acts of officers of Miami Corporation committed "solely" in their official capacities. We hold that the trial court properly found no coverage under the Trustees policy, but erred in denying coverage under the D & O policy.

Plaintiff Miami Corporation is a privately held corporation whose shareholders are family members and family trusts which have received shares from family members. Through several mechanisms, the Miami Corporation manages the assets of the Deering and McCormick families. One such mechanism is the establishment of individual trusts, with a family member and the current president of Miami Corporation typically selected by the beneficiary as co-trustees. Another is the granting by family members of powers of attorney to the current president of Miami Corporation. Miami Corporation officers, including the president of Miami Corporation, service the trusts and trustees and are compensated only by Miami Corporation.

An individual trust in favor of Brooks (the Brooks Trust) was created in 1964. Brooks selected his father, Brooks McCormick, and My-

ron Ratcliffe, then president of the Miami Corporation, as co-trustees, and granted a power of attorney to Ratcliffe. When Ratcliffe resigned in 1978, Brooks granted a power of attorney to Charles E. Schroeder, the new president of Miami Corporation, and selected him to succeed Ratcliffe as co-trustee.

In 1976, Brooks decided to build a house, which he placed into the Brooks Trust as an asset, and began work on the design and construction. He initially retained the architectural firm of Otis Associates (Otis) to assist in the design, signing a contract with that firm on July 20, 1977. He selected Ragnar Benson, Inc. (Ragnar Benson), as the general contractor for construction, entering into a contract on August 19, 1977, for the completion of the "shell" of the house at a price of $398,000. Otis estimated the final cost of the house to be $1.5 million. The total cost ultimately exceeded $1.6 million, approximately half of which was paid by Brooks personally, and half from funds in the Brooks Trust.

In the fall of 1977, Brooks fired and considered suing Otis. The trustees persuaded Brooks not to sue Otis and to complete construction of the house. Brooks complied, paying Otis in full for its services, and continuing with the construction, personally assuming the responsibilities of the architect. In early 1978, Brooks and Ragnar Benson disputed amounts billed by Ragnar Benson exceeding the contract price by $116,606. Ragnar Benson maintained that the excess was due to on-site oral change orders given by Brooks. Brooks paid only the amount due on the contract price, and in December 1978, filed a formal complaint, drafted by Thomas S. Oehring of the Miami Corporation, against Otis and Ragnar Benson in the consumer fraud division of the Illinois Attorney General's office. Brooks, however, wished to file a civil suit against Ragnar Benson and eventually withdrew the complaint.

The trustees advised Brooks to first complete construction of his house and then resolve his dispute with Ragnar Benson. John Anderson, an attorney who assisted Brooks with the Otis and Ragnar Benson contracts, told Brooks and the trustees that litigation between Brooks and Ragnar Benson would be "lengthy, messy, and expensive." Brooks nevertheless instructed the trustees not to pay Ragnar Benson the amount owed in excess of the contract price and asked the trustees to investigate Ragnar Benson's billing statements. The trustees sent a Miami Corporation accountant to review Ragnar Benson's billing records and retained an accounting firm to audit the records. Based on this investigation, the trustees recommended that Brooks make a "compromise" payment of $110,000. Brooks refused,

and the trustees then obtained an opinion from McDermott, Will & Emery that as trustees, they had the power and possibly the obligation to make the compromise payment. The trustees notified Brooks and, over Brooks' objection, paid Ragnar Benson $110,000 on December 20, 1978.

After this payment by the trustee, Brooks retained a series of attorneys to confer with the trustees throughout the construction. In December 1978, Brooks' attorney requested that the trustees not make any additional payments to Ragnar Benson. In January 1979, Brooks' attorney demanded that Miami Corporation employees not be allowed to enter the residence, and Brooks requested that the trustees provide him with a breakdown of the charges paid to Ragnar Benson, threatening to subpoena the documents, if necessary. On March 13, 1979, Brooks' attorney wrote the trustees, indicating that he had reviewed the construction documents and believed that Brooks had a justifiable complaint "not only against Ragnar Benson Company, but [also] in connection with the unauthorized disbursement to Ragnar Benson[.]" In June 1979, Brooks' attorney requested that the trustees produce certain documents, stating that a "failure to provide [the documents] will cause [Brooks' attorney] to seek a remedy in the courts." The trustees complied with Brooks' document requests. Finally, on August 14, 1979, Brooks revoked Schroeder's power of attorney, but reinstated it shortly thereafter.

In February 1980, Brooks told the trustees that he had decided not to live in the house and instructed them to put the house up for sale. The house was sold at a fraction of the construction cost; Brooks exercised his right to withdraw two-thirds of his trust assets; and, effective December 31, 1980, the trustees resigned and were succeeded by the Northern Trust Company.

On January 9, 1981, Brooks filed a complaint for an accounting and other relief against Schroeder, Ratcliffe, Brooks McCormick, Oehring, and Fred Hoppe. On August 6, 1981, motions to dismiss were granted, and on September 3, 1981, Brooks filed an amended complaint adding Otis and Ragnar Benson as parties and dropping Hoppe. The counts against the plaintiffs to this action were dismissed, and the counts against Otis and Ragnar Benson were transferred to the law division. Brooks appealed from the dismissal order, and this court affirmed dismissal of Ratcliffe as a party based on a written release, and otherwise affirmed the dismissal order on all counts except two, which were reversed and remanded. (See *McCormick v. McCormick* (1983), 118 Ill. App. 3d 455, 455 N.E.2d 103.) On remand, the trial court entered summary judgment in favor of Oehring and Miami

Corporation and, following a trial, entered judgment in favor of all defendants. On appeal, the judgment was affirmed in part and reversed in part. (See *McCormick v. McCormick* (1988), 180 Ill. App. 3d 184, 536 N.E.2d 419.) As of November 30, 1986, fees and costs incurred by plaintiffs in the McCormick litigation were $708,025.99.

On August 21, 1981, the Northern Trust Company filed suit against Miami Corporation and Oehring, seeking recovery of $32,000 in dividends retained by Miami Corporation from Brooks' trust to pay outstanding construction debts. This dispute was resolved pursuant to an agreement between the parties. The plaintiffs incurred $12,650.09 in fees and costs relating to the Northern Trust litigation.

In 1981, Dettmers, a construction company, sued Miami Corporation, Oehring, and Brooks for amounts owing for the purchase of window shutters. Brooks settled with Dettmers for $27,000, and Miami Corporation and Oehring won summary judgment. Plaintiffs incurred $28,751.24 in fees and costs in this litigation.

In 1984, plaintiffs commenced the present action, seeking coverage under the Trustees policy and the D & O policy for costs incurred in defending against the above suits. Plaintiffs first sought to procure insurance coverage of the type provided in the Trustees policy in 1975, through its insurance broker, defendant Johnson & Higgins. At that time, no standard policy was available for individuals and entities such as plaintiffs. In the fall of 1978, Johnson & Higgins first approached ISLIC and, at ISLIC's request, completed an application form in November 1978, disclosing financial and other information about Miami Corporation, certain family members, and the trusts. Specifically, ISLIC was provided with detailed descriptions of the operations of the trusts, the responsibilities of the trustees, and the role of Miami Corporation. In this initial application, plaintiffs indicated that they were not aware of any prior claims or of any circumstances which might give rise to a claim against any of the trustees or trusts.

On April 13, 1979, after several months of negotiations, ISLIC agreed to issue a policy, but requested a written reaffirmation of the answers given in the November 1978 application. Schroeder complied with the request on April 20, 1979. In August 1979, a final draft of the proposed policy was ready and ISLIC once again requested that the trustees update their application, but this time by completing another application similar to the November 1978 application. On August 15, 1979, Schroeder completed the second application, indicating that no claims had ever been made against any present or past trustees and that the trustees were not aware of "any circumstances which might give rise to a claim being made against the trust or

trustees." The policy was then issued covering the period August 16, 1979 through August 16, 1980, and was renewed on a yearly basis.

The D & O policy, procured by plaintiffs in 1975 from defendant International, provides coverage to individual directors and officers for losses incurred by them from any claim made against them for a "Wrongful Act" committed in their "individual or collective capacities as Directors and Officers." The policy also provides for reimbursement to Miami Corporation for amounts paid to directors and officers for losses arising from claims made against them for a "Wrongful Act" committed "while acting in their individual or collective capacity."

Plaintiffs gave timely notice to ISLIC and International of the underlying suits, but ISLIC and International each denied coverage under their respective policies. In response to the complaint for declaratory relief, ISLIC asserted 16 different reasons for noncoverage under the Trustees policy and also asserted the affirmative defense of material misrepresentation in the application for the policy by reason of the trustees' failure to disclose the Brooks construction dispute.

On December 12, 1986, a bench trial commenced with proof limited to ISLIC's affirmative defense. Four witnesses, Oehring, Schroeder, Brooks, and Martin Perry, the underwriter of the Trustees policy, testified at that trial. On January 12, 1987, the trial court entered judgment in favor of ISLIC, reasoning that "reasonable minded trustees" should have disclosed the construction dispute. The parties then filed cross-motions for summary judgment on the issue of coverage under the D & O policy. On February 1, 1988, the trial court granted International's motion, accepting International's argument that the policy was limited to claims made against plaintiffs for acts performed "solely" in their capacities as directors and officers of Miami Corporation, which did not include duties performed as trustees or agents of trustees.

I

Plaintiffs maintain first that the trial court erroneously applied an objective standard in determining whether a misrepresentation occurred. Plaintiffs argue that although an objective "reasonable trustee" standard applies in determining whether a misrepresentation was material, the trial court should have applied a subjective standard in determining whether a misrepresentation occurred in the first instance. Under a subjective test, plaintiffs contend, the proper focus is whether Schroeder's responses to the questions on the application were false and known by Schroeder to be false. Plaintiffs argue that

Schroeder did not know the construction dispute might have given rise to a claim against the trustees or a trust, so that he truthfully answered the application questions and no misrepresentation occurred. Finally, plaintiffs argue that the relevant questions on the application were ambiguous and should have been construed against the insurer as not requiring disclosure of the construction dispute.

Defendants do not argue that an objective standard applies in determining whether a misrepresentation occurred, but rather that, contrary to plaintiffs' assertion, the trial court focused on the evidence showing Schroeder had knowledge of circumstances which might have given rise to a claim against the trustees or a trust. Defendants contend that the trial court was not applying an incorrect legal standard when it stated that a "reasonable minded trustee" should have disclosed the construction dispute, but rather was assessing the credibility of the witnesses "by asking if someone else of the same faculties, intelligence and background would perceive or act in the same manner."

■ Under the Insurance Code, no misrepresentation in a written insurance policy application "shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." (Ill. Rev. Stat. 1987, ch. 73, par. 766.) A "misrepresentation" in an application for insurance is a statement of something as a fact which is untrue and affects the risk undertaken by the insurer. (*Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 60 N.E.2d 207; *Cohen v. Washington National Insurance Co.* (1988), 175 Ill. App. 3d 517, 520, 529 N.E.2d 1065.) A material misrepresentation will avoid the contract even though made through mistake or good faith. (*Campbell v. Prudential Insurance Co.* (1958), 15 Ill. 2d 308, 155 N.E.2d 9; *Cohen v. Washington National Insurance Co.*, 175 Ill. App. 3d at 520.) In other words, it is unnecessary for the insurer to prove that a misrepresentation was made with the intent to deceive if it was material to the risk assumed. *National Boulevard Bank v. Georgetown Life Insurance Co.* (1984), 129 Ill. App. 3d 73, 472 N.E.2d 80.

■ In this case, plaintiffs argue that no misrepresentation occurred because Schroeder, who completed the policy application, honestly believed that there were no circumstances which might give rise to a claim against the trustees or a trust. We do not believe, however, that the trial court was required to consider Schroeder's subjective belief. On the contrary, we believe that the trial court correctly concluded that a misrepresentation occurred in this case because of the

facts known to Schroeder at the time of the policy application.

The only case we have found supporting plaintiffs' argument that a subjective standard applies is *Citizens Bank v. Western Employers Insurance Co.* (8th Cir. 1989), 865 F.2d 964. In that case, the plaintiffs sought coverage under a trustees errors and omissions policy and the insurer raised the defense of misrepresentation in the policy application. The applicant had responded in the negative to a question on the policy application asking if he was "aware of any fact, circumstance or situation *** which he has reason to believe might result in any future claim which would fall within the scope of the proposed insurance[.]" (865 F.2d at 965.) The plaintiffs prevailed in the district court, and the Eighth Circuit affirmed, noting that the question contained "a judgmental component and implicitly acknowledge[d] the lack of absolute certainty in the answer. *** [W]hen a question calls for an answer based on interpretation of known facts and circumstances, as distinguished from a simple disclosure of historical facts, the response is measured under Arkansas law by whether the individual answering the question was justified in the belief expressed." 865 F.2d at 966.

Although we have found no Illinois cases on point, one Federal court, applying Illinois law, has squarely rejected the *Citizens Bank* analysis. In *Evanston Insurance Co. v. Security Assurance Co.* (N.D. Ill. 1989), 715 F. Supp. 1405, the court considered an errors and omissions policy application question asking whether the applicant knows of "[any] fact, circumstance or situation indicating the probability of a claim against which indemnification is or would be afforded by the proposed insurance." (715 F. Supp. at 1413.) The court concluded that the question "calls for no judgmental or subjective evaluation, but in traditional objective language requires the disclosure of any facts indicating the probability of a covered claim." 715 F. Supp. at 1414.

We agree with this result and conclude that the question in the policy application in this case likewise required the disclosure of any facts which, objectively considered, might have given rise to a claim, regardless of the applicant's subjective belief. We note that this objective standard is consistent with the standard applicable to questions of materiality (see *Cohen v. Washington National Insurance Co.,* 175 Ill. App. 3d at 520), and with the principle that a material misrepresentation will avoid the contract even though made through mistake or good faith (see *Cohen v. Washington National Insurance Co.,* 175 Ill. App. 3d at 520).

*Great West Steel Industries, Ltd. v. Northbrook Insurance Co.* (1985), 138 Ill. App. 3d 84, 484 N.E.2d 847, relied on by plaintiffs, does not compel a contrary result. In that case, the court did not ap-

ply a subjective standard, but concluded that the insured had no knowledge of a design defect and so had no reason to refer to a roof collapse in response to an application question pertaining to errors or omissions of design, as opposed to construction.

Applying an objective standard here, we note that Schroeder had knowledge of Brooks' dispute with Otis and Ragnar Benson in September 1978 and was aware that Brooks considered suing Ragnar Benson in November 1978; that outside counsel had been consulted and advised the trustees that construction litigation could result in claims against the trustees; that a partial payment to Ragnar Benson was made by the trustees in December 1978 against Brooks' wishes; that Brooks' relationship with the trustees had deteriorated and Brooks hired lawyers to represent him in discussions with the trustees; that Brooks threatened court action in January 1979 if not supplied with certain documents; that Brooks' lawyer had written the trustees in March 1979 regarding the "improper disbursements" to Ragnar Benson; that Brooks threatened legal action in June 1979 if the trustees did not provide him with a list of his assets; and that Brooks revoked Schroeder's power of attorney on August 14, 1979. Under an objective standard, we believe that the trial court properly concluded that the above facts were circumstances known to the trustees which might have given rise to a claim against them or a trust.

Even if we were to apply a subjective standard, we would have difficulty accepting plaintiffs' assertion that they honestly did not believe the Brooks dispute might have resulted in a claim against the trustees or a trust. The trial court would not have been required to accept the trustees' testimony as true (see *Stiefel v. Illinois Union Insurance Co.* (1983), 116 Ill. App. 3d 352, 452 N.E.2d 73), and in light of the undisputed facts known to the trustees at the time the policy application was completed, we would find ample support for the conclusion that a misrepresentation occurred on the ground that the trustees did in fact believe that the Brooks dispute might have given rise to a claim.

■ Finally, there is no merit to plaintiffs' contention that the questions on the policy application were ambiguous and should, accordingly, be construed against defendants. Although knowledge of "circumstances which might give rise to a claim against the trustees or a trust" is a question of fact that might be resolved differently by different triers of fact, "that circumstance does not make the contractual provision itself ambiguous." See *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatkis* (5th Cir. 1986), 799 F.2d 218, 224.

## II

Plaintiffs maintain next that there was insufficient evidence presented at trial establishing that nondisclosure of the construction dispute was a material misrepresentation. Plaintiffs argue that the testimony of the insurance underwriter was self-serving, conclusory, and contradicted by ISLIC's "full and complete understanding of the unusual insured with which it was presented" and ISLIC's subsequent conduct in renewing the policy and actually lowering the premiums even after it had knowledge of the construction litigation. We disagree.

■ The materiality of a misrepresentation in an insurance policy application is a question for the trier of fact. (*Mooney v. Underwriters at Lloyd's, London* (1966), 33 Ill. 2d 566, 213 N.E.2d 283.) Materiality is determined by examining whether the misrepresentation would cause reasonably careful and intelligent persons to regard the fact as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application. (*Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 577, 60 N.E.2d 207; *Cohen v. Washington National Insurance Co.* (1988), 175 Ill. App. 3d 517, 520, 529 N.E.2d 1065.) Materiality may be established by the testimony of the insurer's underwriter. (*Alperin v. National Home Life Assurance Co.* (1975), 32 Ill. App. 3d 261, 263, 336 N.E.2d 365.) The trier of fact's judgment as to materiality should not be set aside on appeal if there is any evidence which, standing alone, tends to support the judgment. *Mooney v. Underwriters at Lloyd's, London*, 33 Ill. 2d at 569.

■ In this case, ISLIC's underwriter testified that had the construction dispute been disclosed, he would have at least excluded claims arising from that dispute. The trial court considered the underwriter's testimony, as well as what reasonably careful and intelligent persons would believe, and concluded that the nondisclosure of the construction dispute was a material misrepresentation. That conclusion is supported by the underwriter's testimony, which was properly considered by the trial court, and by other evidence that the construction dispute involved a significant risk of costly litigation against the trustees. Indeed, plaintiffs' efforts in this case to recover large sums of money from the insurance company following a multiplicity of suits arising from the construction dispute belie their contention that nondisclosure of the dispute was immaterial.

## III

■ Finally, plaintiffs maintain that the trial court improperly

granted International's motion for summary judgment on the count seeking coverage under the D & O policy. Plaintiffs first maintain that the trial court misconstrued the definition of "Wrongful Act" in the policy as limiting coverage to acts committed by an officer "solely" in an official capacity, thereby excluding coverage for acts committed in a different capacity as well. Plaintiffs then argue that the acts which gave rise to the underlying suits are covered either because certain claims against Oehring, Schroeder, Hoppe, and Ratcliffe (henceforth the individual plaintiffs) arose out of their duties as officers, even though the acts complained of were also performed in their capacities as trustees or agents of trustees, or because certain other claims were directed against the individual plaintiffs only in their official capacity. Plaintiffs do not argue that coverage is available for claims which arose out of acts performed by the individual plaintiffs in their capacities as trustees or agents of trustees which did not also arise out of acts performed as officers of Miami Corporation. Rather, plaintiffs contend that coverage is available because even though the individual plaintiffs acted as trustees or agents of trustees, they were also acting pursuant to their duties as officers of Miami Corporation, a corporation established for the purpose of servicing the trusts.

Defendant International maintains that the trial court neither misinterpreted the definition of "Wrongful Act," nor concluded that coverage is available only for acts committed "solely" in the capacity of an officer. The trial court, International argues, concluded that coverage is provided for acts committed in an official capacity, regardless of other capacities in which the officer may have acted, but denied coverage to plaintiffs because they were not sued in their official capacities. International maintains that the trial court reached the correct conclusion, relying on several cases from other jurisdictions holding that acts committed as trustees or agents are not covered under professional liability policies, and that coverage in any event turns on the act committed, not the title of the party who committed the act.

We agree with plaintiffs that coverage is not limited to acts committed by the individual plaintiffs "solely" in their capacities as officers or directors. "Wrongful Act" is defined in the D & O policy as

"any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by the Directors or Officers while acting in their individual or collective capacities, or any matter, not excluded by the terms and conditions of the policy, claimed against them solely by reason of their being Directors or Officers of the Company."

The disjunctive in the definition plainly expands the scope of coverage

and does not limit coverage to acts committed "solely" in an official capacity. The second clause does not limit coverage, so that acts committed in an official capacity are covered even if they are not "solely" official acts, but also acts committed in a different capacity, such as that of trustee or trustee's agent.

International's argument, therefore, rests on finding that no claims were directed against the individual plaintiffs in their official capacities and that the individual plaintiffs' duties as trustees or agents of trustees were separate and distinct from their duties as officers of Miami Corporation. Although the trial court concluded that no claims were directed against the individual plaintiffs in their official capacities, we do not believe that conclusion is supported by the record. Oehring, for example, served as secretary and assistant treasurer of Miami Corporation and never as a trustee to any trust. It also appears that several counts in the *McCormick* litigation were directed against Schroeder as an officer of Miami Corporation. Finally, a claim was directed against Ratcliffe for breach of his duties as attorney in fact, separate from his duties as trustee.

The trial court apparently made no findings with respect to whether the individual plaintiff's official duties included acts committed as trustees or agents of trustees. It does not follow, as International suggests, that because the individual plaintiffs were charged in the underlying suits with breaches of their duties as trustees, they were not acting pursuant to their duties as corporate officers for purposes of coverage under the D & O policy. It is undisputed, for example, that one of the primary duties of the president of Miami Corporation is to act as a co-trustee of the individual trusts.

*North River Insurance Co. v. Endicott* (1986), 151 Mich. App. 707, 391 N.W.2d 454, relied on by International, is inapposite. In that case, the insured was denied coverage under his accountant's malpractice policy for acts committed as a trustee plainly separate from his professional duties. Here, by contrast, the individual plaintiffs' duties as corporate officers are not easily, if at all, distinguishable from their duties as trustees or agents of trustees. Indeed, the unique purpose of Miami Corporation serves to distinguish each case relied on by International, where coverage was not afforded under professional liability policies for acts committed as an agent or trustee.

Accordingly, we conclude that this case should be remanded for a determination of which claims directed against the individual plaintiffs are covered under the D & O policy, either because they were acts of trustees or agents of trustees, yet inseparable from the duties of the officers, or because they were directed against the individual plaintiffs

only in their official capacities.

For the foregoing reasons, we affirm the judgment of the circuit court in favor of defendants on the count alleging coverage under the Trustees policy and vacate the order granting summary judgment in favor of defendants on the count alleging coverage under the D & O policy.

Affirmed in part; vacated in part, and remanded.

HARTMAN and SCARIANO, JJ., concur.