NORTHERN LIFE INSURANCE COMPANY, Plaintiff and Counterdefendant-Appellant, v. IPPOLITO REAL ESTATE PARTNERSHIP *et al.*, Defendants and Counterplaintiffs-Appellees.

First District (2nd Division)   No. 1—92—2223

Opinion filed August 17, 1993.

Peterson & Ross, of Chicago (J. Robert Geiman, David J. Novotny, and Donald A. Murday, of counsel), for appellant.

Donald L. Johnson, of Chicago, and George T. Drost & Associates, Ltd., of Arlington Heights (George T. Drost and Thomas W. Kivlahan, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

John Ippolito, a hemophiliac, died of acquired immune deficiency syndrome (AIDS) in February 1987. He was the insured under six life insurance policies with plaintiff Northern Life Insurance Company (Northern Life or the company). Alleging that the policies were void because Ippolito had omitted material information on the amendment to his application, Northern Life brought this action for declaratory judgment or rescission against the beneficiaries of the policies, defendants Ippolito Real Estate Partnership, Ippolito Beauty Academy, Inc., and International Beauty Systems, Inc. (the Ippolito defendants), which counterclaimed to recover the insurance proceeds. After the circuit court granted partial summary judgment for Northern Life,[1] the case proceeded to a bench trial. At the close of Northern Life's case in chief, the circuit court entered judgment in the Ippolito defendants' favor on their motion for a finding under section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110). We affirm.

The underlying facts are succinctly put in this court's opinion in *Northern Life I*. Briefly, John Ippolito and his brother owned the businesses that are the defendants in this case. In late 1984, after meet-

---

[1]Northern Life had moved for summary judgment on all six policies, but the circuit court entered summary judgment in its favor on only one policy, finding that Ippolito had made an intentional misrepresentation on that application by not revealing that he knew he had AIDS. The court denied the motion on the other five policies, finding that questions of material fact remained. The Ippollitto defendants appealed, and this court affirmed. *Northern Life Insurance Co. v. Ippolitto Real Estate Partnership* (1992), 234 Ill. App. 3d 792, 601 N.E.2d 773 (*Northern Life I*).

ing with their insurance agent, they decided that their life insurance polices were inadequate to fund stock repurchase agreements in the event of the death of either man, so in January 1985, Ippolito applied for five new policies, which differed only as to beneficiary/owner. On January 17, 1985, the Ippolito brothers met with their insurance agent, who transcribed Ippolito's oral answers to the applications' questions, including the following:

> "Has any proposed insured ever had a weight change in the past year?"

> "To the best of your knowledge and belief, is each person proposed for insurance free from mental and physical disorder?"

To the first, Ippolito had replied in the negative; to the second, he had replied affirmatively. The application also contained the following "Declaration":

> "To the best of my knowledge and belief, the answers shown in this application are true and complete ***.

> *** I agree that the insurance for which I am applying will not become effective until (1) a policy is delivered, and (2) full payment of the first premium has been made to the Company. I further agree that both such conditions must occur while all persons proposed for insurance are (1) alive and (2) in the same health as stated in this application."

On May 9, 1985, Ippolito executed an amendment to each application, which contained the following provision:

> "By signing this form, you certify that all of the information stated in the application as amended by this form is true and correct in all material respects as of the date of this form. You also *certify* that the Proposed Insured *** [h]as continued in good health and has not suffered any accident or sickness, or consulted or been attended by a physician." (Emphasis in original.)

Furthermore, the policies themselves stated:

> "The entire contract is:

> 1. this policy; and

> 2. all applications, riders and amendments attached at the time of issue; and

> 3. all later applications, riders and amendments we may attach or send you to attach.

> Unless fraudulent, all statements made by or on behalf of anyone covered by this policy are representations and not warranties. Only statements found in an attached application may

be used to cancel this policy or as our defense if we refuse to pay a claim."

Between executing the applications in January 1985 and the amendments in early May, Ippolito twice visited a physican for minor symptoms. In late July, however, he was admitted to the hospital with pneumocystic carinii pneumonia (PCP); the diagnosis was AIDS. He was discharged from the hospital about two weeks later and died the following February. This suit followed.

At trial, first to testify was Howard A. Jansen, an insurance salesman for 42 years, who had written insurance for Northern Life for three or four years. He had known John Ippolito and his brother for approximately 25 years and sold them insurance for about 20 years. During the last five years of Ippolito's life, Jansen saw him 8 or 10 times a year; from January to May 1985, nothing about Ippolito's appearance was different or suggested he was not in good health. This included no "distinguishable" change in Ippolito's weight.

Jansen explained that after completing the applications, Ippolito had been required to submit to a medical examination by Northern Life's physician, after which Jansen had sent a letter, his own report, and the applications to the Northern Life underwriter for approval. In addition to the approved policies themselves, Jansen later received "delivery requirements" for putting the policies in force, which included the amendments. Jansen informed Ippolito that he had to sign the amendments before the policies would go into effect.

Jeffrey Jacobson, a physician, testified as an expert in infectious diseases on behalf of Northern Life. He explained that prior to March or April 1985, when the test to screen blood products for the HIV virus became available, the only way to diagnose HIV was to have an "AIDS-defining" infection such as PCP. Neither sinusitis nor rhinorrhea (runny nose) was in that category. Nevertheless, from his review of Ippolito's medical records from the hospital and from Ippolito's physician, Dr. Jacobson determined that Ippolito had been HIV-infected[2] in April 1985, based on the July 1985 diagnosis of PCP, which

---

[2]Dr. Jacobson distinguished between HIV (human immunodeficiency virus) and AIDS (acquired immune deficiency syndrome), explaining that in the process of seroconversion, a patient who is HIV-antibody negative becomes HIV-antibody positive, which indicates active infection. He defined "HIV-infected" to mean that the virus has entered the body and is actively multiplying, whereas AIDS, the end-stage of that infection, occurs when the virus has multiplied and destroyed immune cells to the extent that the patient is susceptible to certain opportunistic ("defining") infections.

he characterized as an "AIDS-defining opportunistic infection." In Dr. Jacobson's opinion, the PCP in July, along with Ippolito's exceptionally low lymphocyte count[3] in August 1985, "defined [Ippolito] as having AIDS." Dr. Jacobson added that Ippolito's weight loss was yet another factor in his opinion, particularly coupled with Ippolito's recurrent sinus infection, which, though by itself not an AIDS-defining infection, was consistent with AIDS patients' enhanced susceptibility to more common and more severe "garden variety bacterial infections" than occurred in HIV-uninfected patients. From these facts he reasoned that Ippolito must have been HIV-infected more than two months prior to the PCP diagnosis at the end of July 1985, given that the estimated average incubation period for AIDS was at least eight years and only one reported adult AIDS case from a blood transfusion had occurred within three months of the transfusion. He could not testify within a reasonable degree of medical certainty, however, that Ippolito had been HIV-infected in December 1984, though he conceded that this was "possible, maybe even likely" and that it also was possible that Ippolito was HIV-infected as early as 1975.

Margaret Telfer, Ippolito's physician since 1968, testified that at first she saw him every two or three months. When he began a home transfusion program for his hemophilia, however, she saw him less frequently, that is, only once a year for a checkup and for any new problem, and once or twice a year at Hemophilia Foundation meetings. In January 1985, Northern Life requested medical information on Ippolito, including dates, complaints and abnormal physical findings, duration of illness, diagnosis, treatment, or operation, as well as a history of his hemophilia and elevated blood pressure and copies of EKGs. In her reply, she gave the most recent exam date (August 1984), the blood pressure (normal), and an EKG and chemistry report; she mentioned his lifelong history of hemophilia and described his general health as good. Nothing in her records indicated any requests for additional information. In her opinion, Ippolito had been HIV-infected in January 1985, but at that time she "had absolutely no way of suspecting."

In February 1985, Ippolito was seen by another doctor at Dr. Telfer's office for symptoms including a blocked and runny nose for three days, coughing and bringing up clear sputum, and a low-grade fever; he had no shortness of breath or pain. The diagnosis was phar-

---

[3]The count was 22, whereas the normal range is between 500 and 800. Dr. Jacobson explained that only AIDS causes this count to fall below 200, and that for those who develop AIDS, the drop per month is usually 30.

yngitis (sore throat), ruling out upper respiratory infection, and a sulfa-antibiotic was prescribed; he was not weighed. Dr. Telfer herself saw Ippolito when he again visited her office on April 26; this time he complained of a sinus headache and a stuffy, runny nose. According to her notes from that visit, she did not weigh him, but "he [wa]s clearly about 20 pounds thinner" than the last time she had seen him, but she had not weighed him then either. The last time she had weighed him, in October 1983, his weight had been 181 pounds. When she asked if he had been dieting or had been having problems with his appetite, he had said no. He did not volunteer that he had noticed the weight loss, but he agreed when she remarked on it. She described his white count at that time as "a little on the low side, but not dangerously so," commenting that the drop could have been attributable to a viral infection, such as the sinus trouble. She determined that he had acute sinusitis, an inflammation of the membranes lining the sinuses, for which she prescribed the same antibiotic he had received before.

Even though none of Ippolito's symptoms would have caused her at that time to diagnose him as having AIDS, Ippolito's hemophilia enhanced the possibility of exposure to HIV through a blood transfusion. The weight loss coupled with the acute sinusitis had troubled Dr. Telfer, who had written in her notes that she was "very worried about a possible onset of either pre-AIDS or AIDS."[4] She had not conveyed her concern to Ippolito or to his family because her practice was to be absolutely sure before telling a patient that she "suspect[ed] something very bad." She had not discussed with him the risk that hemophiliacs run for HIV infection, even though she and he had been present at a late 1984 symposium that had included a discussion of symptoms such as shortness of breath, "tremendous weight loss," and the appearance of large lymph nodes or other masses in any area of the body. Her notes also indicated that if the problem continued, certain tests should be ordered; these tests were surrogate tests for HIV, for which there was then no test. The result of one test she ordered was that she discovered that Ippolito had been exposed previously to the Epstein-Barr virus. Her notes also suggested possible future use of an antiparasitic treatment, which had been effective in the short

---

[4]Dr. Telfer defined "pre-AIDS" as AIDS-related complex (ARC), the symptoms for which included night sweats, chronic fever, chronic low-grade infections, and a 20% body weight loss. She testified that it is usually followed by AIDS; only "a handful" (3% or 4%) of those with ARC do not develop AIDS. Once infected with HIV, 60% develop ARC or AIDS.

term against AIDS, according to an article in a British medical journal.

Dr. Telfer next saw Ippolito at a fundraising party in May 1985. She testified, "He was remarkably better. *** I could not detect the evidence of weight loss. In fact, I really wondered if I had been wrong. And he was cheerful and happy and back at work." When asked if it appeared to her that in the space of a month Ippolito had put 20 pounds back on, she replied, "No, but the drawn features had disappeared. He really looked better. *** I wouldn't say that [he had regained all the weight that he appeared in April to have lost], but he didn't look—he didn't look ill." When she had complimented him that he seemed to be much better, he had replied, "Yes, I am."

Dr. Telfer did not see Ippolito again until late July 1985, when he was admitted to Michael Reese Hospital. He weighed 161 pounds. He complained that "he was feeling lousy," that he was very short of breath and had been sick for a while; he was coughing but not producing sputum. After a battery of tests, including an AIDS test that had become available in May or June 1985, she concluded that he had PCP and, therefore, AIDS and informed him of her diagnosis. Prior to Ippolito's death the next year, only 1 of her 100 patients had developed AIDS.

Northern Life's final witness was Michael Shanin, its vice-president in charge of life insurance underwriting, who described the elements of Ippolito's files at the company. One was a Medical Impairment Bureau (MIB) report, which compares an applicant's medical history with information given on other insurance applications. Shanin testified that other than the letters to and from Dr. Telfer and a credit check, no investigation of Ippolito's applications had been performed, apparently overlooking the medical exam Northern Life had required in January 1985. The file contained no information about Ippolito's February 4 or April 26 doctor visits, or about Ippolito's weight loss and Telfer's concern about AIDS or pre-AIDS. He gave two reasons for requiring the amendments to reestablish that there had been no change in Ippolito's health between the date of the original applications and the date of acceptance of the policies: Ippolito's request for an insurance plan different from that for which he initially had applied, and the lapse of time between the applications in mid-January and the delivery of the policies in early May.

Shanin testified that if Ippolito had not signed the amendments, Northern Life's general practice dictated that the policies would not have been put into force. In response to the court's query, Shanin

agreed that if a policy is "stale," "sometimes the company might ask for a follow-up from the personal physician as to anything new with this patient." After Shanin explained again that Northern Life had no reason to believe that Ippolito had visited Dr. Telfer between January and May, the following colloquy occurred:

"THE COURT: Suppose [Ippolito] went [to a doctor] for a cold, for a runny nose, would you send a follow-up letter to the attending physician?

THE WITNESS: Not if we knew it was just a cold.

But here, again, it depends on the age, the amount of the insurance, and what medical condition—

THE COURT: I understand.

THE WITNESS: —the person had.

THE COURT: The exposure.

THE WITNESS: Right.

If we felt it was pure and simple just a cold, probably not.

Q. [Plaintiff's counsel:] What if Northern Life's information is just that here was a doctor's visit?

A. And we didn't know what the circumstances were, we would—

Q. Then what would be the policy?

A. On a case like this, we would have gone back to the doctor and asked for an update on the medical record.

THE COURT: Okay. And if that update on the medical records had shown that the treating doctor here, Dr. Telfer, had a concern about AIDS or pre-AIDS, would that had affected Northern Life's underwriting decision?

A. If we would have received that, we, in all likelihood, would have declined. The very least we would have done would be to postpone for six months and say that we would entertain a new application at that time. ***

Q. If at the end of that six months the individual reapplied and it was disclosed to Northern Life that there was an AIDS diagnosis, in terms of Northern Life's regular policy what would have happened?

A. A pure and simple decline."

Shanin also testified that Northern Life would have imposed a six-month wait in the event of an unexplained weight loss of 10 or more pounds.

Shanin acknowledged that at the time of Ippolito's insurance applications, it was "a hot topic and well-known in the insurance industry that hemophiliacs were at a greater risk [of AIDS], along

with gays and people who used intravenous drugs." The court then asked,

"With respect to your underwriting manual, what was your policy—small 'p'—in early 1985 with regard to hemophiliacs and the possibility of AIDS complications with this high-risk group?

THE WITNESS: There was no discussion in any of the printed manuals at that point in time with regard to hemophilia and AIDS or AIDS in any respect that early in the game.

THE COURT: Okay. And what did your manual say at that time with regard to weight loss?

THE WITNESS: Our policy with regard to any unexplained weight loss of 10 pounds or more [was that it] needs to be investigated."

When Northern Life concluded its case in chief, the Ippolito defendants moved orally for judgment in their favor. Northern Life countered that the question before the court was not whether Ippolito had intended to deceive the company but whether, under section 154 of the Illinois Insurance Code (Ill. Rev. Stat. 1991, ch. 73, par. 766), Ippolito had made a material misrepresentation, that is, whether the applications (including the amendments) contained an untrue statement that was material to the risk. In the amendments, the company continued, Ippolito did not disclose that he had seen a doctor twice between January and May, and had Ippolito not omitted this information, it would have initiated a follow-up from which it would have learned Telfer's concerns about AIDS or pre-AIDS, which in turn would have resulted in at least a temporary refusal to insure. Northern Life argued alternatively that a condition precedent to the policies was that they became effective only if, at delivery, the insured was in fact in the same health as stated in the original application. It did not matter that Ippolito did not know that he had HIV, Northern Life explained, likening the circumstance to the effect of a mutual mistake of fact in contract law generally.

The court granted the Ippolito defendants' motion for judgment in their favor. It first focused on Ippolito's lack of awareness of his HIV infection in January, as reflected in his decision to change the policy type and thereby draw out the application process, and on Dr. Telfer's own lack of knowledge during the April visit. As for the omission of information about the two doctor visits, the court observed that Shanin had conceded that it was unlikely that Northern Life would

have investigated further even if Ippolito had reported those visits as for a cold or runny nose.

## I

We have recounted in detail the evidence presented by Northern Life at trial in light of the procedure for ruling on motions under section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110) and the applicable standard of review:

> "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1110.)

In applying this statute:

> "[t]he trial court *** first must determine whether plaintiff has presented a *prima facie* case. If plaintiff has not, then the trial court should grant the motion and enter judgment in defendant's favor. If plaintiff *has* set forth a *prima facie* case, the trial court then weighs the evidence. [Citations.] A trial court's determination on the motion will not be reversed on appeal unless the decision is contrary to the manifest weight of the evidence." (Emphasis in original.) *Zannini v. Reliance Insurance Co. of Illinois, Inc.* (1992), 147 Ill. 2d 437, 449, 590 N.E.2d 457, 462.

See also *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43 (explaining burden of proof (presentation of some evidence of each element of cause of action) and distinguishing analysis from that applicable on a motion for directed verdict in a jury trial).

■ Thus, to survive the Ippolito defendants' motion, Northern Life had to present some evidence during its case in chief that Ippolito made material misrepresentations in his applications, including the amendments, or that a condition precedent of the insurance contracts had not been met, or that Ippolito had breached his fiduciary duty to the company. If the company did meet its burden, *Kokinis* teaches that the circuit court then would have been obliged to weigh the evidence to determine whether any of the evidence necessary to the company's *prima facie* case had been negated. Only if Northern Life met its initial burden and if, after weighing the evidence, the court determined that no evidence essential to Northern Life's cause of action had been negated, would judgment for the Ippolito defend-

ants have been improper. In reviewing the circuit court's ruling, we will reverse only if, when we view the evidence in the light most favorable to the Ippolito defendants, we conclude that no rational trier of fact could have reached the circuit court's decision. *Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31* (1992), 153 Ill. 2d 508, 514, 607 N.E.2d 182, 185 (explaining manifest weight of the evidence standard in review of agency determination).

## II

Northern Life insists that it presented a *prima facie* case for avoiding the insurance policies by offering some evidence of each of its three separate grounds for voiding the policy and that there was no evidence negating any of the essential elements it proved. We take each theory in turn, keeping in mind that "[i]nsurance forfeitures are not favored as insurance serves important purposes in contemporary society, and courts should be quick to find facts which support coverage." *A.D. Desmond Co. v. Jackson National Life Insurance Co.* (1992), 223 Ill. App. 3d 616, 620, 585 N.E.2d 1120, 1122.

## A

With regard to the condition precedent, Northern Life stresses, Ippolito certified in the amendments as a condition precedent of coverage that he had continued in the same state of health, which he had assessed in his application as "excellent." Because the testimony indicates that Ippolito was HIV-infected in April, it continues, he cannot have been in "excellent" health and free from physical disorder when the policy was delivered in May. Northern Life then reasons that it may avoid the policy because its condition precedent to coverage was not met in that between January and May he had become HIV-infected, had lost 20 pounds, and had developed sinusitis.[5]

Despite Northern Life's assertion that "Illinois courts routinely have held that an insurer is not liable under a policy when such conditions are not met," it apparently is able to cite only a 1915 appellate court case and a 1935 Seventh Circuit case in addition to

---

[5]Northern Life also points out another unmet condition precedent, *i.e.*, that Ippolito was not in "excellent" health in January because he was already HIV-infected. Northern Life has explicitly limited its challenge to the statements in the amendments, however, so we do not address the effect, if any, of Ippolito's answers to the original application in January.

cases from other jurisdictions. We find these cases easily distinguishable. In *Sulski v. Metropolitan Life Insurance Co.* (1915), 196 Ill. App. 76, 77, *aff'd* (1916), 274 Ill. 516, 113 N.E. 862, the insurance policy stated that "no obligation is assumed by the company prior to the date hereof, nor unless on said date the insured is alive and in sound health"; the policy also noted that it would be void if the proposed insured had been treated by a physician for any serious disease or complaint or had had any pulmonary disease. The proposed insured had been treated for tuberculosis prior to the date of issuance, however, so it was obvious that he had tuberculosis on the issuance date and thus was not in good health on the day in question. In addition, *Sulski* does not indicate that the proposed insured had a subjective, albeit mistaken, belief that his health was good or that he was unaware of his tuberculosis. More on point, perhaps, is *Continental Illinois National Bank & Trust Co. v. Columbian National Life Insurance Co.* (7th Cir. 1935), 76 F.2d 733, *cert. denied* (1935), 296 U.S. 617, 80 L. Ed. 438, 56 S. Ct. 138, in which the proposed insured did not have leukemia when applying for insurance but did contract it by the delivery date. There too, however, the condition precedent was "sound health," not, as here, "same health." The same holds true for the cases from other jurisdictions on which Northern Life relies.

█ With regard to the construction of the documents at issue, our analysis begins with their plain meaning, mindful that courts use liberal construction and resolve any uncertainty in favor of the insured. (*Bituminous Casualty Corp. v. Gust K. Newburg Construction Co.* (1991), 218 Ill. App. 3d 956, 960, 578 N.E.2d 1003, 1005 (ambiguous duty to defend provision), *appeal denied* (1992), 143 Ill. 2d 636, 587 N.E.2d 1011.) Here, as noted above, Ippolito was not asked in the amendments whether he was in "good" or "sound" health. Instead, he was asked to certify that he was in the "same health as stated in [the January] application," or, in other words, that he would have given the same answers in May that he had given in January. Accordingly, we look to the questions asked and the answers given in January, when he replied that he was free from mental and physical disorder and enjoyed excellent health, but only "to the best of his knowledge and belief." From the evidence presented at trial, it appears that to the best of Ippolito's knowledge and belief, he was still free from mental and physical disorder and was still in excellent health, given that Dr. Telfer had said nothing to him of her concerns about HIV infection, and Northern Life presented no evidence that Ippolito had increased his knowl-

edge or otherwise had cause to change his belief. Certainly, Ippolito's runny nose and other minor complaints would not have changed his assessment of his health, which he had described as excellent in spite of his hemophilia. As for the weight loss, Northern Life presented no evidence whatsoever of Ippolito's weight between October 1983 and July 1985, so it is impossible to say that his weight had changed between the initial applications and the amendments. Lastly, from Shanin's testimony, one may infer that a cold or similar minor illness was too inconsequential to be considered a "change in health" for the purposes of the application. Thus, for the purposes of the amendments' condition precedent, Ippolito was indeed "in the same health as stated in the January application[s]" when he executed the amendments in May.

Even if we were to ignore the application's emphasis on Ippolito's knowledge and belief, the result would be no different, for evidence of the essential elements of Northern Life's theory was negated by other testimony. For example, with regard to the alleged change in Ippolito's HIV infection between January and May, Northern Life's own expert admitted that he could not testify with a reasonable degree of medical certainty that Ippolito was HIV-free in January 1985, volunteering that Ippolito was "possibl[y], maybe even likely" HIV-infected prior to January, and Dr. Telfer testified that in her opinion Ippolito had been HIV-infected in January. Similarly, although Dr. Telfer testified that she had believed that Ippolito had lost 20 pounds between October or November 1984 and April 1985, she also testified that when she saw him in May, she had wondered if she had been wrong, for she could detect no evidence of weight loss. Likewise, Jansen testified that he had noticed no weight loss between January and May. As noted above, moreover, Northern Life presented no evidence of Ippolito's weight from October 1983 until January 1985. On his application, he stated that he weighed 168 pounds and at his medical examination for the insurance he weighed 163½ pounds, or approximately 20 pounds less than his normal weight of 181, indicating that any weight loss had occurred before, not after, his initial application in January.[6] Accordingly, we cannot say that the circuit court's decision to grant the Ippolito defendants' motion on Northern Life's condition precedent theory was such that no rational trier of fact could have come to the same conclusion.

---

[6]As noted elsewhere, Northern Life did not challenge Ippolito's statements on his application in January, including that he had not suffered a weight loss of 10 or more pounds in the six months prior to his application.

B

Alternatively, Northern Life claims that a potential insured has a fiduciary duty to notify an insurer of any changed condition arising during the pendency of an application if that change materially affects the insurer's risk, and Ippolito's breach of that duty permits it to avoid the insurance contract.

Contrary to Northern Life's interpretation of our earlier opinion in this cause, we did not hold that an insured has a fiduciary duty to its insurer to disclose changes in health that arise during the pendency of an application. In *Northern Life I*, we merely explained that the law imposes on prospective insureds a duty of good faith and fair dealing, which requires that they notify the insurer upon discovering any facts that make portions of an application no longer true, if the new information would materially affect the risk undertaken by the insurer. *Northern Life*, 234 Ill. App. 3d at 803, 601 N.E.2d at 780-81.

■■ We begin our analysis by noting that unlike the cases cited by Northern Life, here there is no evidence of fraudulent intent or lack of good faith. The "intervening discoveries" that Northern Life suggests are the weight loss and two illnesses that prompted Ippolito's two visits to his doctor. As we explained above, however, the record makes plain that any weight loss occurred prior to January, not between January and May, and thus did not occur during the pendency of the application. As for the two illnesses and the resultant doctor's visits that occurred between January and May 1985, they did not change the truthfulness of any of his answers to the original application, which asked only for his knowledge and belief. Likewise, following *Stipcich v. Metropolitan Life Insurance Co.* (1928), 277 U.S 311, 72 L. Ed. 895, 48 S. Ct. 512, we note that the record reveals that Ippolito did not discover any material facts from these events, for these illnesses were merely "garden variety bacterial infections" that even Shanin testified would have evoked no follow-up from Northern Life if reported as "just a cold." Consequently, although Ippolito had a common law duty to disclose facts material to Northern Life's risk if discovered during the pendency of his application, Northern Life did not present a *prima facie* case for Ippolito's breach of that duty because it presented no evidence that the weight loss occurred during the application period, and it presented evidence that revelations about Ippolito's sore throat and sinusitus, by themselves, would have had no effect on its assessment of its risk.

## C

Northern Life's third ground for reversal is that it made a *prima facie* case concerning Ippolito's material misrepresentations on the amendments because, contrary to his certifications there, he had not continued in good health since the original application in January, he had suffered two illnesses, and he had consulted a physician twice. Thus, the Illinois Insurance Code allows it to avoid the policy because these misrepresentations materially affected its acceptance of the risk or hazard it assumed. Ippolito could not decide whether these facts were material, the company asserts, and he had a duty to disclose this information so that Northern Life could make that determination. Such vital information certainly was material, Northern Life insists, in that it would have declined to issue a policy if it had known that Ippolito's doctor thought he might have developed AIDS or pre-AIDS.

The applicable statutory provision on which Northern Life's argument is based is section 154 of the Illinois Insurance Code, which provides as follows:

> "No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance *** shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." (Ill. Rev. Stat. 1985, ch. 73, par. 766.)

In this context, a "misrepresentation" is a statement of fact that is untrue, or an omission of fact; it is considered "material" if "reasonably careful and intelligent persons would have regarded the facts stated [or omitted] as substantially increasing the chances of the events insured against, so as to cause a rejection of the application." (*American Country Insurance Co. v. Mahoney* (1990), 203 Ill. App. 3d 453, 463, 560 N.E.2d 1035, 1042-43, *appeal denied* (1990), 135 Ill. 2d 553, 564 N.E.2d 834; see also *Northern Life*, 234 Ill. App. 3d at 801, 601 N.E.2d at 779.) The statute permits avoidance of the policy even if the misrepresentation is the result of mistake or good faith. *Ratcliffe v. International Surplus Lines Insurance Co.* (1990), 194 Ill. App. 3d 18, 25, 550 N.E.2d 1052, 1057.

■ Here, there is no question that Ippolito's answer in the amendments was that he had not seen a physician and he had not suffered a weight loss. As noted above, however, the company presented no evidence that the weight loss occurred between January and May, so that answer to the amendments was not false. As for

the two illnesses and resultant visits to his doctor, even if we agree that Ippolito should have disclosed them to Northern Life, the company did not present any evidence that this information, standing alone, would have been material, that is, that to a reasonably careful and intelligent person, two visits to a doctor over a few months' time for "garden variety bacterial infections" such as a runny nose and a sore throat would have substantially increased the chance of Ippolito's death, thereby causing rejection of the application. On the contrary, Shanin testified that Northern Life would have issued the policy if it had known that the visits were for minor illnesses. Moreover, although the record demonstrates that if Northern Life had learned of Dr. Telfer's concerns, it likely would have declined to insure Ippolito, the company did not present any evidence to the effect that it would have learned her thoughts if Ippolito revealed the visits: Northern Life had not asked for Ippolito's medical records when reviewing his original application, and it did not provide any evidence that had it asked Dr. Telfer for an update, she would have shared her concerns. This prospect in fact is made particularly unlikely given Dr. Telfer's testimony that at the time of the amendments, she herself wondered if she had been wrong about the weight loss, which had prompted her speculation in the first place. In light of this record, therefore, we believe that a rational trier of fact could have found that Ippolito's two minor infections and the doctor's visits were not the type of facts that a reasonably careful and intelligent person would have regarded as substantially increasing the chance of Ippolito's death.

In short, Northern Life either failed to meet its evidentiary burden in presenting a *prima facie* case on one or more essential elements of each of its three theories, or if it met its burden, the evidence was negated. Consequently, the circuit court's ruling that defendants were entitled to judgment was not against the manifest weight of the evidence.

For the reasons stated above, we affirm the judgment of the circuit court.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.