EUGENE KNYSAK, Plaintiff-Appellee, v. SHELTER LIFE INSURANCE COMPANY, Defendant-Appellant.

Fifth District    No. 5—94—0434

Opinion filed June 30, 1995.

Hinshaw & Culbertson, of Chicago (Stephen R. Swofford, Mark D. Bauman, and Christine L. Olson, of counsel), for appellant.

Edward J. Kionka, of Carbondale, and Jerald J. Bonifield, of Belleville, for appellee.

JUSTICE LEWIS delivered the opinion of the court:
"Born but to die, and reas'ning but to err;"
Alexander Pope, *An Essay on Man*, Epistle II.

The appellate courts definitely need some direction from the supreme court in defining "misrepresentation," when construing applications for automobile, health, or life insurance. What has happened is that in *Campbell v. Prudential Insurance Co. of America* (1958), 15 Ill. 2d 308, 155 N.E.2d 9, the supreme court held that the "or" in section 154 of the Insurance Code of 1937 (now 215 ILCS 5/154 (West 1992)) should be construed in the disjunctive rather than in the conjunctive. That section reads as follows:

> "No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor, of which a copy is attached to or endorsed on the policy, and made a part thereof. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made *with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.*" (Emphasis added.) 215 ILCS 5/154 (West 1992).

Our appellate courts have since paid lip service to *Campbell* but have proceeded in most cases to reason and decide the insurance coverage as if section 154 was written in the conjunctive when there has not been a showing of actual intent to deceive by the insured. We will discuss this matter in greater detail later in this opinion.

First, we must present the facts. Defendant, Shelter Life Insurance Company, appeals from a jury verdict that awarded plaintiff $18,068.28 in damages for breach of contract (count I) and $32,000 in damages for intentional infliction of emotional distress (count V). Defendant raises the following issues: whether the trial court erroneously denied defendant's motion for a judgment *n.o.v.* or, in the alternative, for a new trial, due to the fact that defendant did not breach the contract with plaintiff because (1) plaintiff misrepresented his wife's health condition on the insurance application, and (2) plaintiff failed to prove the elements of a cause of action for intentional infliction of emotional distress. For the reasons listed below, we affirm the trial court's decision as to count I and reverse as to count V.

In May 1986, plaintiff met with defendant's agent, Sandra Biemfohr (Biemfohr), and applied for a health insurance policy covering himself and his wife, Anna Knysak (Anna). Because of an inability to speak English, Anna did not attend this meeting and plaintiff was assured by Biemfohr that there would be no problem if he answered

the questions for his wife. The application contained numerous questions regarding the past and present health of both applicants concerning whether either applicant ever had or was treated for certain diseases. Of import are the questions that pertained to Anna's past and present health status, in particular questions 21a and 21g, relating to occurrence and treatment of high blood pressure and diabetes, respectively. On behalf of his wife, plaintiff answered both of these questions "no."

At the end of the application, above the signature line, was the following language: "The owner declares to the best of his or her knowledge and belief that the answers recorded in this application are complete and true ***." Based on plaintiff's answers found in the application, a health insurance policy was issued covering plaintiff and his wife.

Anna suffered a stroke and was hospitalized in April 1987, and plaintiff submitted a claim to defendant which was denied. Defendant based its decision on an investigation which revealed that Anna had been diagnosed with and treated for both high blood pressure and diabetes since November 1984, with a series of office visits and laboratory tests documented from that time and continuing until just prior to her stroke. According to defendant, the high blood pressure and diabetes were preexisting conditions as defined by the policy, present during the two-year period preceding coverage, and therefore excluded.

Defendant's special claims supervisor, Carl Carver (Carver), sent a letter to plaintiff in September 1987 and offered to reform the policy to exclude coverage for Anna. This letter further stated that because plaintiff did not accurately answer the questions of the application regarding Anna's health, there were preexisting conditions that, according to the policy provisions, would not be covered. Plaintiff rejected the reformation, and defendant rescinded the policy and refunded plaintiff's premium.

In a letter to Anna's physician, Dr. R. Brad Ringhofer (Dr. Ringhofer), Carver stated: "I do not believe Dr. Knysak wilfully withheld information with intent to defraud. I believe him to be an honest person. I have communicated this to him." Carver further testified that had defendant known Anna's complete health information, it would not have issued a policy that covered her, regardless of whether or not plaintiff answered the questions on the application to the best of his knowledge and belief. Defendant's underwriter, Vicki Fain (Fain), also testified that if defendant had been made aware of Anna's health status, no policy would have been issued to cover her. Although Anna was deceased at the time of trial, her death was not related to the claim made by plaintiff.

Plaintiff testified that as a result of defendant's denial of his claim, he became nervous, upset, and anxious, he had shakiness and difficulty speaking, and he had sought advice from a "heart doctor" for these problems. As a result of defendant's refusal to pay his claim, plaintiff filed a five-count complaint. Defendant filed affirmative defenses that alleged misrepresentations in the insurance application and a preexisting condition. Counts I and V were presented to the jury, and verdicts for the plaintiff were returned as stated above.

A trial court will grant a motion for judgment *n.o.v.* only when all evidence, viewed in the light most favorable to the nonmoving party, so greatly favors the movant that no opposite verdict could be upheld. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Further, a motion for a new trial will be considered and a jury's verdict overturned only if the verdict is palpably in error. (*Krawczyk v. Polinski* (1994), 267 Ill. App. 3d 258, 642 N.E.2d 185.) As to count I, we find that the evidence presented does not overwhelmingly favor defendant; thus, the jury's verdict was not in error.

■ Defendant offered three affirmative defenses to count I. First, defendant contends that plaintiff intentionally misrepresented his wife's health so as to deceive. Second, that plaintiff made misrepresentations that were material to defendant's acceptance of the risk or hazard presented in the application. Third, that Anna's high blood pressure and diabetes were preexisting conditions present in Anna during the first two years of coverage and thus were excluded under the terms of the policy. In support of the first and second affirmative defenses, defendant offers section 154 of the Illinois Insurance Code (215 ILCS 5/154 (West 1992)), concerning misrepresentations and false warranties, which we have set out aforesaid. We must first determine whether or not there was a misrepresentation and, if so, whether it was material to the policy of insurance.

> "A misrepresentation in an application for insurance is [defined as] a statement of something as a fact which is untrue *and* material to the risk, and which the insured states, knowing it to be untrue, in an attempt to deceive, or which he states positively is true without knowing it to be true and which has a tendency to mislead. [Citations.] Misrepresentations will avoid a policy *** if they are, in fact, false *and* material to the risk, even though the applicant acted through mistake or in good faith." (Emphasis added.) (*Weinstein v. Metropolitan Life Insurance Co.* (1945), 389 Ill. 571, 577, 60 N.E.2d 207, 210.)

Notice that the supreme court in the often-cited *Weinstein* case used the conjunctive, requiring, or at least implying, that an element of

deceit on the part of the insured is necessary before there is a misrepresentation. (We could not help but note that even the defendant in this case did not object to the form of the issue instruction that set out its affirmative defenses in the conjunctive.) Thirteen years later, the supreme court decided *Campbell*, and that court has not revisited section 154 and its construction of the section as disjunctive rather than the conjunctive.

It is interesting to note that in *Campbell*, the court, after discussing why section 154 should be construed in the disjunctive, ended its opinion by saying:

> "The point is that the insured, by withholding relevant information, prevented the insurer from appraising the risk on the basis of the facts as they existed." (*Campbell*, 15 Ill. 2d at 313, 155 N.E.2d at 11.)

Thus, in *Campbell*, the insured had the actual intent to deceive. Further, *Weinstein* was cited in *Campbell*, although not on the conjunctive-versus-the-disjunctive issue.

Where *Campbell* might be considered harsh is in its discussion of the blending in section 154 of warranties and representations. *Campbell* could be construed as holding that the insured is warranting that the insured has no preexisting condition that materially affects the acceptance of the risk or hazard assumed by the company. The fact that a warranty is made by the insured may be the reason behind the often-quoted statement originating in *Western & Southern Life Insurance Co. v. Tomasun* (1934), 358 Ill. 496, 502, 193 N.E. 451, 453, that there can be a material misrepresentation that would avoid the contract "even though made through mistake or in good faith." The insured's intent or knowledge, either objective or subjective, is really not relevant, if you follow *Campbell* to its logical conclusion. The sole issue may simply be as to whether there was a preexisting condition that would materially affect the acceptance of the risk or hazard assumed by the insurer. If an insured warrants that he and his dependents are in good health, when unbeknownst to the insured or anyone else in the world, they are not, the insured has made a false warranty or misrepresentation under section 154, according to the reasoning in *Campbell*.

When you carefully review the many cases decided since *Campbell*, it is apparent that the appellate courts have basically upheld the defeat or avoidance of the policy when there has been actual intent to deceive. If, however, there have been innocent answers made to questions on the insurance application, the courts have found a way to circumvent *Campbell*. (See *Northern Life Insurance Co. v. Ippolito Real Estate Partnership* (1993), 252 Ill. App. 3d 464,

624 N.E.2d 1266; *Northern Life Insurance Co. v. Ippolito Real Estate Partnership* (1992), 234 Ill. App. 3d 792, 601 N.E.2d 773 (*Northern Life I*); *Ratcliffe v. International Surplus Lines Insurance Co.* (1990), 194 Ill. App. 3d 18, 550 N.E.2d 1052; *Cohen v. Washington National Insurance Co.* (1988), 175 Ill. App. 3d 517, 529 N.E.2d 1065; *Kohlmeier v. Shelter Insurance Co.* (1988), 170 Ill. App. 3d 643, 525 N.E.2d 94; *Logan v. Allstate Life Insurance Co.* (1974), 19 Ill. App. 3d 656, 312 N.E.2d 416.

Why our trial and appellate courts do not follow *Campbell* is a matter for speculation, but what is apparent is that the lower courts do not like what they perceive to be a harsh result in the *Campbell* ruling. Even the court in *Campbell* noted the argument that section 154 was passed by the legislature to benefit the insured and not the insurer, but then the court went on to discuss the elimination of refined distinctions between the effect of false warranties and misrepresentations. If section 154 is construed in the disjunctive, it definitely does not favor the insured. To the contrary, section 154 is a disaster for the insured and a boon to the insurer.

First, it just does not seem right to hold that an innocent statement can be a misrepresentation or a false warranty. The words "misrepresentation or false warranty" denote some deceit. Second, it seems unfair for an insurance company to charge a premium for risks that it is not insuring against. Third, it does not seem right for an insured to be misled into believing that he and his family are covered and then discover that he is facing financial ruin.

As implied in the quote at the outset of this opinion, we are dying the minute we are born. Kidneys, hearts, intestines, livers, and backs may be in a terrible condition unbeknownst to anyone. In the past few decades, we have discovered through advances in medicine that people are predisposed to having certain diseases or defects because of their genes. A person could have congenital heart problems, a predisposition towards diabetes, cancer, lupus, Huntington's disease, schizophrenia, and even alcoholism, all of which would materially affect the acceptance of the risk assumed by the insurer. Arthur Ashe and "Magic" Johnson contracted AIDS that went undetected for some time. People in power plants are just now dying 20 years after exposure to asbestos. Many diseases and mental and physical defects do not manifest themselves for years. Yet, when the disease or defective organ comes to light after the application for insurance, the insured may suddenly discover that his safety net does not exist.

The appellate courts have devised various reasons, including contrasting subjective with objective intent (*Ratcliffe,* 194 Ill. App. 3d

18, 550 N.E.2d 1052), ambiguous and vague wording of the application's questions (*Kohlmeier,* 170 Ill. App. 3d 643, 525 N.E.2d 94), time of discovery of the risk (*Northern Life I,* 234 Ill. App. 3d 792, 601 N.E.2d 773), and insufficient knowledge of medicine by the insured (*Logan,* 19 Ill. App. 3d 656, 312 N.E.2d 416), for avoiding the issue of whether an illness or disease existed on or before the application was submitted that materially affected the acceptance of the risk or the hazard assumed by the company. Another method employed by our appellate courts to avoid *Campbell* is to say that the question of whether a misrepresentation is material is strictly a jury question. (See *Marshall v. Metropolitan Life Insurance Co.* (1949), 337 Ill. App. 498, 86 N.E.2d 262, *aff'd* (1950), 405 Ill. 90, 90 N.E.2d 194. But see *Ratcliffe v. International Surplus Lines Insurance Co.* (1990), 194 Ill. App. 3d 18, 550 N.E.2d 1052; *Garde v. Country Life Insurance Co.* (1986), 147 Ill. App. 3d 1023, 498 N.E.2d 302 (where the court held that the misrepresentation may be of such a nature that a summary judgment would be in order).) Juries would be expected to be sympathetic to an insured who had not made any actual misrepresentations.

■ We first must dispose of defendant's contention that plaintiff made a misrepresentation with actual intent to deceive when he applied for the health insurance. Defendant's application only asks plaintiff to declare that the answers made are true to the best of his knowledge and belief. The application did not ask plaintiff to certify or to state positively that Anna was in good health. Plaintiff testified in open court that at the time he applied for the insurance he knew nothing about Anna's health problems. Moreover, defendant has provided no evidence to counter plaintiff's testimony. Further, Carver, defendant's claims supervisor, admitted that he did not believe that plaintiff acted with intent to deceive. The jury, after observing plaintiff and judging his credibility, believed that plaintiff did not make misrepresentations. Because we have previously held that in an application for insurance any question of misrepresentation is a question of fact to be determined by a jury (*Ehret v. Loyal Protective Life Insurance Co.* (1969), 112 Ill. App. 2d 289, 251 N.E.2d 101), we cannot reverse the jury's decision on this ground.

We now address the uncomfortable question of whether to apply *Campbell* to what was inarguably a material risk, diabetes and high blood pressure, and thus follow an old (1958) supreme court decision, or do we avoid the harshness of *Campbell* by using other reasoning developed by our appellate courts since 1958? We respectfully requested the supreme court in *Peile v. Skelgas, Inc.* (1994), 163 Ill. 2d 323, 645 N.E.2d 184, to address a new theory and to review an old

case decided by that court. We received an answer without being rebuked for our impudence.

■ We do not believe that the supreme court in *Campbell* or the legislature intended for section 154 to mean that an innocent insured and his dependents would not be covered for diseases and illnesses unknown to the insured at the time the insured makes the application. Section 154 speaks of misrepresentations and false warranties. It does not say representations and warranties. The prefix "mis" and the word "false" denote deceit. Further, section 154 does not speak of preexisting illnesses or diseases. If no written application were made and a policy issued, the policy would not be void because of the pre-existence of a disease or illness. We only void the policy because of what is said or omitted by the applicant. If section 154 is read in the disjunctive, the certification by the insured in the application would be superfluous. It would not really matter if the applicant thinks he is telling the truth, is lying, or leaves the question blank, because if the applicant or a family member has a material preexisting condition, the policy would be void.

How then can the law require an applicant to have the knowledge of God or of the most advanced scientific means of discovery of illnesses or diseases? Further, the advances in medicine may soon show that most illnesses or predispositions to a disease are present from the birth of the insured, and that such illnesses or predispositions are discoverable, if only the insured had undertaken expensive tests. Thus, the vast majority of good-faith applicants may be guilty of making "misrepresentations and false warranties," if section 154 is construed to allow the voidance of policies solely because there were preexisting conditions that materially affected the risks to the insurer.

Our decision in *Kohlmeier v. Shelter Insurance Co.* (1988), 170 Ill. App. 3d 643, 525 N.E.2d 94, is dispositive of this issue. In *Kohlmeier*, Shelter appealed the jury's award and argued that because plaintiff misrepresented his daughter's health condition on the application, the policy was void. (*Kohlmeier*, 170 Ill. App. 3d at 647, 525 N.E.2d at 97.) We disagreed, stating that because plaintiff's daughter was not diagnosed with the disputed condition until after the policy had been issued, there was no misrepresentation. (*Kohlmeier*, 170 Ill. App. 3d at 653, 525 N.E.2d at 101.) In the case at bar, plaintiff was not aware of his wife's condition until after the policy had been issued.

Moreover, the application signed by plaintiff in this case contains language drafted by defendant that plaintiff declares the information true to the best of his knowledge and belief. This declaration was the truth of the matter as found by the jury. If plaintiff had certified,

warranted, and represented that his wife was in good health, there may have been a duty upon plaintiff to be sure of the truth of what he was representing or warranting to the insurer. Since plaintiff was only representing and warranting as to his knowledge and belief, and not as to Anna's actual health, the jury was justified in finding that no misrepresentations were made. *Campbell* could be distinguished from the case at bar on this ground alone. There were simply no representations or warranties made by plaintiff as to Anna's health.

■ Defendant's third affirmative defense states that Anna's claim is excluded because it is a preexisting condition and thus not covered under the policy guidelines. Defendant defines a preexisting condition to mean:

> "any Sickness or condition of a Covered Person arising or present during the 2 year period immediately preceding the effective date of your policy:
>
> a. for which a Covered Person received medical advice or treatment from a physician; or
>
> b. which caused symptoms which would have caused an ordinarily prudent person to seek diagnosis, care or treatment within 12 months prior to the effective date."

It should be noted, if we may digress and return for a moment to the construction of section 154, that the above-quoted definition is not only superfluous to a disjunctive reading of section 154, it is also in conflict with and weakens the impact of a disjunctive reading of section 154. If the policy is void because of a preexisting condition that materially affected the risk to the insurer, who cares whether the insured during the two years prior to the issuance of the policy received medical advice or treatment from a physician or had symptoms that would cause an ordinary person to see a physician? The policy is void no matter what the insured did, unless the insured set forth in the application all of his preexisting conditions and the insurer accepted the increased risk.

Returning to defendant's third affirmative defense, the sickness or condition at issue is a stroke. While there is authority holding that heart disease is a material factor to be considered when determining the risk assumed by an insurance company (*Massachusetts Mutual Life Insurance Co. v. Leberis* (N.D. Ill. 1984), 595 F. Supp. 157), we are aware of no authority supporting such a holding for a stroke. Defendant argues that Dr. Ringhofer's testimony that Anna's hypertension and diabetes "might or could" have caused the stroke is proof of the preexisting condition requirement. However, the policy's exclusion requires that the applicant be treated or diagnosed with the sickness or condition prior to the application; as

the evidence showed, Anna's stroke was first diagnosed in April 1987, after the policy was in force. As the jury determined, the third affirmative defense was not proved.

●5 As to the issue of emotional distress, this court has previously stated that the elements required to prove a case for intentional infliction of emotional distress are (1) extreme and outrageous conduct, (2) intent by the defendant to cause or a reckless disregard of the probability of causing emotional distress, (3) severe or extreme emotional distress suffered by the plaintiff, and (4) actual or proximate causation of emotional distress by defendant's outrageous conduct. (*Kohlmeier v. Shelter Insurance Co.* (1988), 170 Ill. App. 3d 643, 525 N.E.2d 94.) Defendant contends that its refusal of plaintiff's medical claim was not extreme and outrageous conduct. Extreme and outrageous conduct sufficient to create liability for intentional infliction of emotional distress is defined as conduct that exceeds all boundaries of human decency. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765.) A person will not be liable where he has done nothing more than demand legal rights in a permissible way, although aware that such demand is likely to cause emotional distress. (*Public Finance Corp.*, 66 Ill. 2d at 92, 360 N.E.2d at 768.) Cases where the courts have allowed recovery for severe emotional distress tend to involve abusive language, threats, and extended harassment by the defendant. (*Public Finance Corp.*, 66 Ill. 2d at 92, 360 N.E.2d at 768.) The mere denial of a claim by an insurer does not give rise to the required level of extreme outrageousness.

Here, defendant notified plaintiff, via a private letter, that there was no coverage for his wife's illness. In a letter to plaintiff's physician, defendant went so far as to define the plaintiff as an honest man, never questioning plaintiff's motives. No evidence has been provided to show defendant's intent or recklessness in causing plaintiff emotional distress, the requirement of the second prong of the test delineated in *Kohlmeier.*

Plaintiff contends that defendant was in a position of power over plaintiff and, as a result, caused severe emotional distress. While it is possible that extreme and outrageous conduct can arise from an abuse of power, such abuse usually flows from relationships involving the police, school authorities, landlord-tenant disputes, and creditors. (*Doe v. Calumet City* (1994), 161 Ill. 2d 374, 641 N.E.2d 498.) In those circumstances, the courts must look to whether a defendant had a reasonable belief that its objective was legitimate and, if so, will give more freedom to a defendant pursuing a legitimate solution. (*Doe,* 161 Ill. 2d at 393, 641 N.E.2d at 507.) Here, Carver and Fain both testified that routine underwriting procedures were followed, and

they stated that if defendant had known of Anna's health condition, her coverage would have been denied. After the policy was issued, defendant testified that it sought to remedy the situation by offering reformation. Only after plaintiff refused that option was the premium returned and the policy rescinded. Defendant was doing no more than pursuing its own legitimate solution to the problem it found. Applying the law to the facts of the case at bar, we find that plaintiff has not proven the first or second element required to maintain an action for intentional infliction of emotional distress.

As to the third required element, severe emotional distress, plaintiff has failed to prove he suffered such severe distress. Plaintiff testified that he was very upset, very nervous, and very depressed. Dr. Ringhofer testified that plaintiff at different times suffered from mild to moderate or worse depression because of defendant's failure to pay Anna's medical bills. He also testified that the depression was caused by a combination of factors, including the fact that plaintiff's wife had suffered a stroke. As a general rule, the law will intervene only when the distress inflicted is so intense and painful that no reasonable person could be expected to endure it. (*Mucklow v. John Marshall Law School* (1988), 176 Ill. App. 3d 886, 531 N.E.2d 941.) While we sympathize with plaintiff's feelings during his difficult time, the distress here does not meet the severity of the prong set out in *Kohlmeier* and defined in *Mucklow*. No doubt, any person whose insurance claim for a substantial amount of money was denied will suffer depression. Reasonable people, however, endure the denial of expected benefits and financial reversals, as did plaintiff in this case. There was nothing in the record that indicated that plaintiff was hospitalized, sought and received psychiatric treatment, or even was prescribed medication. The jury's verdict as to count V was clearly against the manifest weight of the evidence.

Affirmed in part; reversed in part.

WELCH and CHAPMAN, JJ., concur.